# In the United States Court of Federal Claims

No. 17-206C
Filed: December 20, 2017

| | |
|---|---|
| * * * * * * * * * * * * * <br> **STATE OF CALIFORNIA,** <br> acting by and through <br> **BETTY T. YEE, STATE** <br> **CONTROLLER,** <br>         **Plaintiff,** <br> **v.** <br> **UNITED STATES,** <br>         **Defendant.** <br> * * * * * * * * * * * * * | Motion for Summary Judgment; Cooperative Agreement; Breach of Contract; Contract Interpretation; Incorporation by Reference |

**Martin Lobel**, Lobel, Novins & Lamont, LLP, Washington, D.C., for plaintiff.

**Zachary J. Sullivan**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Of counsel was **Amy M. Siadak**, Attorney-Advisor, General Law, United States Department of Interior, Office of the Solicitor – Rocky Mountain Region, Lakewood, CO. With them were **Allison Kidd-Miller**, Assistant Director, Commercial Litigation Branch, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, Civil Division, and **Chad A. Readler**, Acting Assistant Attorney General.

**O P I N I O N**

## HORN, J.

In the above-captioned case, plaintiff, Betty T. Yee, acting through and for the State of California, alleges breach of contract by defendant United States, acting through the Department of the Interior (DOI). Alleging jurisdiction in this court is proper pursuant to the Tucker Act, 28 U.S.C. § 1491 (2012), plaintiff, in its simplified, brief, amended complaint filed in this court, requests this court to find that the DOI violated the terms of a cooperative agreement entered into with the State Controller's Office (SCO) by withholding payments totaling $296,459.94 from the SCO based on a dispute as to how salary, fringe benefits, and indirect costs should be calculated under the agreement for the period of October 1, 2010 to September 30, 2014. Plaintiff requests $296,459.94 in damages, plus interest, the costs of this action, and any other just and proper relief.

**FINDINGS OF FACT**

In September 2010, the DOI and the SCO entered into "Grant/Cooperative Agreement" Number M10AC20010 (the Agreement), which was subsequently renumbered to "Grant/Cooperative Agreement" Number D12AC70004 in a modification executed on November 3, 2011. Under the terms of the Agreement, the SCO provided audit and investigation services to the DOI "in accordance with Section 205 of the Federal Oil and Gas Royalty Management Act of 1982, as amended . . . ." The Agreement had an effective date of October 1, 2010, an initial term of two years and nine months, and an option to be extended for an additional three years, with the concurrence of both parties. In June 2013, the parties entered into a modification with an effective date of July 1, 2013, which extended the Agreement, without change, for three years, and provided that the term of the Agreement would end on June 30, 2016.

The Agreement provided that the SCO would "conduct audits and investigations related to oil and gas revenues owed to the United States and shared with the State, which are attributable to leased Federal onshore property and offshore 8(g) [41 U.S.C. § 1337(g)] zone property within the State . . . ." Additionally, the SCO was responsible for conducting "audits and investigations related to solid or geothermal revenues, which are attributable to Federal lands within the State's boundaries," "pursuant to Public Law 102-154." Part 2 of the Agreement provided that the DOI would "reimburse the State up to 100 percent of allowable costs for audits and/or investigations of Federal oil, gas, and solid mineral leases . . . ."

The SCO was subject to several reporting requirements under the Agreement. Pursuant to Part 5.2(B) of the Agreement, the SCO was required to submit financial reports, "as required by 43 CFR 12 [(2010)]," to ensure that expenses were recorded in the proper period. Under Part 5.2(C)(4), the SCO was required to submit a request for reimbursement within sixty days after the end of a payment period. In accordance with Part 5.2(C)(4), the SCO's request for reimbursement had to be submitted with a "summary of activities (e.g., number of audits and/or investigations performed) and other actions taken" and a "certified summary of costs incurred during the period for which the State has requested reimbursement." Part 5.2(C)(4)(b) further provided:

> Summary schedules shall list direct labor hours, hourly rates, travel costs, and training costs by employee; as well as fringe benefit amounts, overhead rates and amounts, and other expenditures agreed upon by the State and the CO. Documentation is required for any change during the year of the fringe benefit or overhead rates.

Part 6.4 of the Agreement governed "Payment of Reimbursable Costs." Under Part 6.4(B), the DOI was responsible for reimbursing the SCO "for approved costs incurred under this Agreement in accordance with 43 CFR 12(A) Administrative and Audit Requirements and Cost Principles for Assistance Programs." At the time the parties entered into the Agreement in September 2010, 43 C.F.R. Subpart 12(A) prescribed the administrative requirements and cost principles for grants and cooperative agreements

2

entered into by the DOI. See 43 C.F.R. § 12.1 (2010).  The regulation at 43 C.F.R. § 12.2 (2010) indicated that a cooperative agreement with a state is subject to several Office of Management and Budget (OMB) Circulars, including OMB Circular A-87, which established principles and standards for determining costs incurred under grants, cost-reimbursement contracts, and other agreements with state, local, and Indian tribal governments.  See OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments (2004). Additionally, Part 8 of the Agreement, titled "Standard Award Terms and Conditions," stated that "[a]wards are based on the application submitted to, and as approved by DOI, and are subject to the terms and conditions incorporated either directly or by reference in the following: . . . 43 C.F.R. 12(A) . . . 43 C.F.R. 12(C) . . . ."

Additionally, under the terms of the Agreement, the compensation that the SCO paid to its employees working under the Agreement was reimbursable as a direct cost subject to the limitations set forth in Part 6.5(B) of the Agreement. Part 6.5(B)(1) stated:

> Salaries and wages may not exceed the State's established policy and practice including the established pay scale for equivalent classifications of employees whose salaries are financed from non-Federal sources, which will be certified by the State, nor may any individual salary or wage exceed the employee's annual rate of compensation for similar functions performed immediately prior to employment hereunder. Merit or promotion increases of employees performing hereunder may not exceed those provided by the State's established policy and practice.

The Agreement at Part 6.5(C) stated, "[f]ringe benefits shall be allowed in accordance with the State's established accounting system." Pursuant to Part 6.5(D) of the Agreement, "[o]verhead rates shall be allowed in accordance with the State's established audited accounting system." Part 7.1(D), however, required that the SCO "maintain complete cost records for the Agreement period in accordance with the Generally Accepted Accounting Principles (GAAP). Such records shall be in sufficient detail to clearly demonstrate the total actual costs associated with the project . . . ."

During the course of performance at issue in the current case, October 1, 2010 to September 30, 2014, the SCO billed the DOI for salary, fringe benefits, and indirect costs, according to the SCO, in accordance with California's State Administrative Manual, also referred to as "SAM" throughout the record before the court, which, plaintiff noted, "had been in effect in California for over 30 years." The SCO utilized a formula contained in Section 8740 of California's State Administrative Manual, titled "BILLING FOR SERVICES OF EMPLOYEES PAID ON MONTHLY BASIS," for calculating the hourly billing rate for employees paid on a monthly basis.[1] (capitalization in original). The state

---

[1] Section 8740 of California's State Administrative Manual appears to have been revised annually to incorporate state employee billing rates for California's upcoming fiscal year. See Dep't of Gen. Servs., California State Administrative Manual § 8740 (2017).

3

formula merged an employee's salary, fringe benefits, and indirect costs into a single hourly billing rate for that employee.

The DOI sent plaintiff a draft Attestation Engagement Report for the period of October 1, 2013 through September 30, 2014 prepared by the Department of Interior Office of Natural Resources Revenue, State, and Tribal Support (ONRR) to the SCO, which reviewed "fulfillment with the terms of your Cooperative Agreement . . . ." The draft Attestation Engagement Report provided a "walk-through of how [the SCO] charged [the DOI] for salary, fringe and the indirect costs (ICR/overhead) . . . ." (emphasis omitted). The draft Attestation Engagement Report and subsequent final Attestation Engagement Report appear to address indirect costs and overhead costs as a single category of costs labeled "ICR costs." According to the draft Attestation Engagement Report, the formula used by the SCO began with 2,920 hours per employee. The formula then subtracted eight hours per day for each Saturday, Sunday, and holiday occurring during California's fiscal year from the 2,920 hours. The draft Attestation Engagement Report indicated that the resulting amount was then reduced by the "non-working hours related to" personal leave, training, and other absences. That amount, 1,724 hours, was divided by twelve months to determine a theoretical amount of monthly working hours. To compensate the SCO for the cost of an employee's fringe benefits, the formula then added the state staff benefits contribution percentage[2] to one-hundred percent and divided that number by the theoretical monthly working hours of 144. The resulting number was known as the "SAM Factor."

The draft Attestation Engagement Report stated that to determine the "total cost" of an employee for each month, the SCO would first multiply the employee's monthly salary by the "SAM Factor." Next, the SCO multiplied the resulting amount by the rates for fringe benefits and "ICR." That amount was then multiplied by the number of hours the employee worked under the Agreement to determine the "total cost" of the employee. The SCO charged the total cost of the employee to the DOI as reimbursable costs for each employee's wages, fringe costs, and "ICR."

Although the DOI stated that it "did not detect any information indicating that fraud, illegal acts, or violations of provisions of the Agreement had occurred," the draft Attestation Engagement Report questioned the SCO's method of how the "SAM Factor" was applied, as well as the SCO's pooling of each employee's costs for salary, fringe benefits, and indirect costs into a single hourly billable rate. The draft Attestation Engagement Report claimed that the SCO's utilization of the formula in Section 8740 of California's State Administrative Manual caused the SCO to overstate its expenses on the requests for reimbursement that the SCO had submitted to the DOI. Specifically, after providing a "walk-through" of how the SCO charged the DOI for salary, fringe benefits, and indirect costs, the report found "that every hour billed after reaching the 'actual

---

[2] The state staff benefit contribution percentage consisted of costs associated with employee retirement, old age, survivor, and disability insurance, Medicare, and health, vision, and dental benefits.

working hours' of 144 causes an overstatement of costs."[3] (emphasis omitted). The draft Attestation Engagement Report indicated that this "complex issue" would not have occurred had the SCO provided the hourly rates and fringe benefit amounts separate from the overhead costs. Based on its findings, the DOI expanded the scope of its review to include federal fiscal years 2011, 2012, 2013, and 2014 and "compared the voucher costs to 100% of the actual costs that you incurred for each month." (emphasis omitted). After comparing the SCO's "vouchers" to the SCO's "actual costs," the DOI asserted that it had overpaid the SCO by $296,459.94 for costs related to salary, fringe benefits, and "ICR costs" during the period of October 2010 to September 2014.

The SCO responded to the DOI's draft Attestation Engagement Report by letter dated July 29, 2015. In the letter, the SCO stated that it "strongly disagree[d]" with the draft report's findings. The July 29, 2015 letter also provided:

> For over 30 years, the State of California has adopted the overhead and SAM factor to all of its clients, private or public. ONRR has accepted it thus far, yet now wants the State to adopt ONRR's methodology and interpretation of the State's royalty accounting of fringe benefits. This is counter to the terms of the cooperative agreement. Section 6.5.C (page 15) states, "Fringe benefits shall be allowed in accordance with the State's established accounting system."
>
> The same language is used for overhead rates. ONRR has no contractual authority to dictate California's polices and accounting practices and control. The Department of Interior cannot require the State to develop a costly separate accounting of its federal royalty program.

The SCO also claimed that it had provided 100% of its incurred allowable costs to the DOI "according to the State's accounting and billing practices" and the Agreement.

On October 7, 2015, the DOI sent an e-mail message to the SCO that included the DOI's final Attestation Engagement Report for the period of October 1, 2013 through September 30, 2014, the scope of which also was expanded to include federal fiscal years 2011, 2012, 2013, and 2014. The final Attestation Engagement Report contained virtually identical findings as did the draft Attestation Engagement Report. In the final Attestation Engagement Report, the DOI reiterated that the SCO needed to "break out" its salary, fringe benefits, and indirect costs into separate categories, apply its fringe rate "to *actual* hours worked and to *actual* leave and holidays incurred," and request reimbursement "for actual leave, rather than accrued leave." (emphasis in original). The DOI indicated that each reimbursement voucher should show a separate total for salary, fringe benefits, and indirect costs for each employee. The DOI "agree[d] that fringe benefits should be allowed in accordance with the State's established accounting system so long as the cost does not exceed one hundred percent of the allowable cost." The DOI asserted that its obligation only was "to reimburse up to 100% for employees' *actual, incurred* costs who

---

[3] According to the draft Attestation Engagement Report, in California's fiscal year 2014, the theoretical monthly working hours used to calculate the "SAM Factor" was 144 hours.

work directly on the program" and stated that it would "reimburse monthly salaries in full, rather than on an hourly basis for all employees who work 100% on the federal program." (emphasis in original). The DOI rejected plaintiff's justification that the "SAM Factor" has been used by California for over thirty years. According to the defendant, the overstatement of costs was not identified until the review for the draft Attestation Engagement Report. As a result of the SCO's billing practices, in the final Attestation Engagement Report, the DOI, once again, claimed that it had overpaid the SCO $296,459.94 in reimbursed costs related to salary, fringe benefits, and "ICR costs" during the period of October 2010 to September 2014. The final Attestation Engagement Report concluded by stating that the DOI would be withholding $24,705.00 on a monthly basis from each voucher submitted by the SCO for the next twelve months.[4]

On October 29, 2015, counsel for SCO, who is also plaintiff's counsel of record in the case currently before the court, filed a brief, six paragraph appeal with the DOI requesting that the DOI permit the SCO "to continue to use its 'established accounting system.'" The SCO maintained there "are many perfectly legitimate ways to calculate costs," and alleged that Part 6.5 of the Agreement permitted the SCO to calculate fringe benefits in accordance with California's State Administrative Manual. Plaintiff's counsel suggested that ONRR should have sought the advice of the DOI Solicitor's Office "rather than . . . checking with the OIG [Inspector General's Office]," and that "[i]f ONRR does not like the way California calculated its costs over the last 30 years, it can negotiate that issue in 2016 when a new agreement is scheduled to be adopted."

On January 13, 2016, the DOI denied the SCO's appeal. In its denial, the DOI explained:

> fringe rates under the SAM factor for State Fiscal Year 2014 are based on employees working 144 hours per month, such that the State recovers 100% of its fringe costs upon billing for 144 hours each month per employee. However, the State billed for more than 144 hours per month per employee, which resulted in the State receiving more than 100% of its actual costs. Accordingly, [the DOI] is requesting that the State True Up the costs so that only 100% of the actual costs are reimbursed, not more than 100% of the actual costs as is currently the case, and is described in detail in the Final Attestation Engagement Report.

The DOI noted that Part 2 of the Agreement specifically stated that the DOI "will reimburse the State <u>up to 100 percent of allowable costs</u> . . . ." (emphasis in original). In its denial, although the DOI agreed that the SCO could account for its costs on a cash basis, as the SCO indicated it was doing on its monthly government's Standard Form 270, the DOI argued that "the use of the SAM Factor in California's requests for reimbursement, in

---

[4] The final Attestation Engagement Report again noted "[d]uring the course of the engagement, we did not detect any information indicating that fraud, illegal acts, or violations of the provisions of the Agreement had occurred. This AE [Attestation Engagement Report] was not specifically designed to detect fraud, however, STS Management/COR is authorized to take proper steps if fraud is detected."

effect, charges [the DOI] on an accrual basis, which overstates salary, ICR and fringe" and charges the DOI "for leave which has not been taken." According to the DOI, the SCO's billing practices violated OMB Circular A-87, which provided "[w]hen a non-Federal Entity uses the cash basis of accounting, the cost of leave is recognized in the period that the leave is taken and paid for. Payments for unused leave when an employee retires or terminates employment are allowable in the year of payment . . . ." The DOI again requested that the SCO "True Up" its costs each month if the SCO continued "to use the SAM Factor . . . ."

Plaintiff originally filed its complaint in the United States District Court for the District of Columbia. The case, subsequently, was transferred to this court. Thereafter, plaintiff initiated proceedings in this court by filing a bare bones "AMENDED COMPLAINT FOR DECLARATORY AND MONETARY RELIEF," which alleged that the DOI had breached the Agreement and requested $296,459.94 in damages, plus interest, and costs. (capitalization in original). Defendant filed its answer to plaintiff's amended complaint, and plaintiff immediately responded by filing, a once again, bare bones motion for summary judgment, with a pile of attachments, most of which were not referenced in plaintiff's motion, and none of which were referenced by exhibit number except in a two and half page attachment to plaintiff's brief titled "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE." (capitalization in original). Plaintiff's motion for summary judgment requested:

> WHEREFORE: California respectfully requests this Court to enter an **Order** Declaring that California is entitled under its Agreement with ONRR to use California's State Administrative Manual to allocate overhead costs and to **Order** the Department of the Interior to refund the money's [sic] taken from California because of its erroneous interpretation of the Agreement.

(capitalization and emphasis in original). At a status conference, and after discussion with the parties, this court determined that plaintiff's original motion for summary judgment, as originally filed, was moot because plaintiff had filed for a declaratory judgment. After another status conference, the court allowed the parties an opportunity to exchange information and to discuss possible settlement, which was not successful. Thereafter, defendant filed a motion for summary judgment, and attached numerous documents relevant to the case. Three days later, in another very brief, two and a half page filing, plaintiff's counsel filed an opposition to defendant's motion for summary judgment, and, despite the court's earlier ruling, requested that the court order defendant to respond to plaintiff's, now moot, motion for summary judgment. On September 21, 2017, this court issued an order directing plaintiff to respond to defendant's motion for summary judgment and suggesting plaintiff file a cross-motion to defendant's motion for summary judgment to join the issues. Plaintiff ultimately did file an again brief cross-motion for summary judgment, which plaintiff indicated should incorporate, by reference, the arguments and documents attached to plaintiff's previous filings, including the plaintiff's mooted motion for summary judgment. Thereafter, on October 10, 2017, defendant filed a reply in support

of its motion for summary judgment and defendant's opposition to plaintiff's cross-motion for summary judgment, following which plaintiff filed another short reply.[5]

## DISCUSSION

The court considers the parties' cross-motions for summary judgment under Rule 56 of the Rules of the Court of Federal Claims (RCFC) (2017). RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2017); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See

---

[5] In total, plaintiff has submitted four filings regarding summary judgment to this court. Excluding exhibits, each of plaintiff's filings was five pages or less, including case caption and signature block, and contained minimal citations to relevant case law. Plaintiff's briefs consisted mainly of repetitive, conclusory statements alleging that plaintiff was entitled to summary judgment because the Agreement provided that the SCO could use California's State Administrative Manual to calculate fringe benefits and overhead rates, without analysis.

Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015), subsequent determination, 129 Fed. Cl. 742 (2017). If the moving party makes such a showing, the

burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Florida Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378, (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. See B.F. Goodrich

Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1148; Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d at 2; Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. at 748.

"Questions of law are particularly appropriate for summary judgment." Oenga v. United States, 91 Fed. Cl. 629, 634 (2010) (citing Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in Dana Corp.] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")); see also Santa Fe Pac. R.R. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

"Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)) ("The starting point for any contract interpretation is the plain language of the agreement."), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483-84 (2013).

"'"In contract interpretation, the plain and unambiguous meaning of a written agreement controls."'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'"

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435, reh'g denied and en banc suggestion declined

(Fed. Cir. 1996) (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Prof'l, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014) (noting that a contract must be interpreted in context, giving meaning to the document as a whole) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999)); McHugh v. DLT Solutions, Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015); see also Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

The Federal Circuit also has indicated that "'[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d at 1380-81); see also LAI Servs., Inc. v. Gates, 573 F.3d at 1314; Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir.

2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)); Beard v. United States, 125 Fed. Cl. at 158 (quoting Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008)) ("In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but "construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.").

It has been "'a fundamental precept of common law that the intention of the parties to a contract controls its interpretation.'" Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (quoting Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer . . . ."); see also Canpro Invs. Ltd. v. United States, 130 Fed. Cl. at 347 ("Contract interpretation requires determining the intention of the parties.").

In their cross-motions for summary judgment, both parties agree that there are no material facts in dispute for purposes of the issues addressed in the parties' motions for summary judgment, although the defendant has not consented to all the facts included in plaintiff's exhibit to its initial motion for summary judgment titled "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE." (capitalization in original). The parties also agree that whether the DOI breached the Agreement at issue is a question of contract interpretation, which is a matter of law that the court can resolve through summary judgment. The parties, however, disagree as to interpretation of the language of the Agreement. Defendant, in its motion for summary judgment, describes the issues in the above-captioned case as:

> 1. Whether the United States is entitled to summary judgment on the issue of whether only costs incurred are eligible for reimbursement under the cooperative agreement.
>
> 2. Whether the United States is entitled to summary judgment on the issue of whether the cooperative agreement is subject to the cost principles and administrative requirements prescribed in 43 C.F.R. Part 12(A), including OMB Circular A-87, *Cost Principles for State, Local, and Indian Tribal Governments.*

Plaintiff states the legal issue as:

> whether California is allowed to calculate its costs in accordance with § 6.5.C of the Agreement which specifically provides that "Fringe benefits shall be allowed in accordance with the State's established accounting system." or, [sic] as defendant insists, California is required to use OMB's method of accounting for costs pursuant to § 6.4.B.

In its motion for summary judgment, defendant argues that OMB Circular A-87 applies to the Agreement because Part 6.4 and Part 8 of the Agreement expressly incorporated by reference 43 C.F.R. Subpart 12(A), which incorporated by reference OMB Circular A-87. See 43 C.F.R. § 12.2 (2010) ("All financial assistance awards and subawards, in the form of grants and cooperative agreements, in accordance with paragraph (b) of this section, are subject to subparts C, D, E, and F of this part . . . [and] [OMB Circular] A–87, 'Cost Principles for State and Local Governments' . . . ."). According to the defendant, the SCO "can and should bill in accordance with both (1) California's State Administrative Manual and (2) the cooperative agreement and applicable Federal regulations, including OMB Circular A-87." The defendant contends that plaintiff's "suggestion that Section 6.5.C means that cost calculations need only comply with the State Administrative Manual to be reimbursed is contrary to the clear and unambiguous language of the cooperative agreement and applicable Federal regulations and OMB circulars."

The defendant also argues in its motion for summary judgment that the Agreement is a cost-reimbursement cooperative agreement, and, as such, "only costs incurred are eligible for reimbursement . . . ." Defendant does not dispute that the SCO is entitled to be reimbursed for salaries paid to its employees working under the Agreement, fringe benefits, and indirect costs, nor does defendant dispute the type of fringe benefits and indirect cost rates that the SCO charged to the DOI. The defendant also does not dispute that the SCO may use California's State Administrative Manual to calculate fringe benefits and indirect costs. The defendant, however, alleges that the SCO overcharged the DOI for salaried employees "by treating salaried employees as hourly employees and using an hourly rate that did not reflect the [employee's] salary" when multiplied by the actual number of hours worked. The defendant also challenges the SCO's "indirect costs because they were calculated based on the incorrect salary and fringe benefits amounts." In support of its position, defendant notes that Part 2 of the Agreement provides that the DOI "'will reimburse the State up to 100 percent of allowable costs for audits and/or investigations,'" and that the SCO was required to submit a request for reimbursement and a certified summary of costs incurred pursuant to Part 5.2(C)(4) of the Agreement. Additionally, the defendant argues "that only costs incurred are eligible for reimbursement is expressly stated in Section 6.4, Payment of Reimbursable Costs," which provides that the DOI "will reimburse the State for approved costs incurred under this Agreement in accordance with 43 C.F.R. 12(A) . . . ." The defendant alleges that the SCO's billings violated the cost principles and standards in 43 C.F.R. Subpart 12(A) because the SCO "sought reimbursement for a cost that it did not even incur" and "objects to being billed a higher amount for these items than what California incurred." Finally, the defendant

asserts that the "rule of interpretation construing an ambiguous agreement against the drafter is inapposite because the cooperative agreement is clear and unambiguous."

As noted above, plaintiff, in its cross-motion for summary judgment, simply asserts, with little analysis, that it was entitled to calculate fringe benefits and indirect costs in accordance with California's State Administrative Manual, and that the DOI incorrectly "required California to use OMB's method of accounting for costs." In its filings, the plaintiff concludes that it is "entitled to summary judgment under the specific language of § 6.5.C of the Agreement," which plaintiff believes is "clear, unambiguous and dispositive." Alternatively, plaintiff also contends that Part 6.4(B), "on which defendant rests its case, is at best ambiguous . . . ." Plaintiff suggests that Part 6.4(B), which provides that the DOI will reimburse the SCO for approved costs incurred in accordance with 43 C.F.R. Subpart 12(A), must be ambiguous because Part 6.4(F) "provides for cost reimbursement of expenses subject to 43 CFR 12 that have not otherwise been provided for in this Agreement."[6] According to plaintiff, however, fringe benefits have been "specifically provided for in § 6.5.C" as being allowed in accordance with California's State Administrative Manual. Plaintiff contends that even if there was an ambiguity in the Agreement as to whether the SCO could use California's State Administrative Manual to calculate costs, plaintiff is entitled to summary judgment because if there is an arguable ambiguity "'the general maxim [is] that [such] a contract should be construed most strongly against the drafter, which in this case was the United States.'" (alterations in original).

After the DOI completed a review of the SCO's performance under the Agreement "to ensure fulfillment with the terms of your Cooperative Agreement," the DOI denied plaintiff's claim for reimbursement as described above in greater detail, in the final Attestation Engagement Report sent to plaintiff, citing multiple deficiencies in several respects. The final Attestation Engagement Report also contained specific recommendations, including that plaintiff should "break out and report on your vouchers *actual* direct labor hours, hourly rates, travel costs, and training costs by employee; as well as fringe benefit amounts, overhead rates and amounts, and other expenditures, per the Cooperative Agreement terms." (emphasis in original). The final Attestation Engagement Report further listed specific "overstated costs" which defendant instructed plaintiff to reimburse to the federal government. The final Attestation Engagement Report also, specifically, addressed each of the responses plaintiff had submitted to the draft Attestation Engagement Report. Although, in both the draft and final Attestation Engagement Report, the DOI specifically analyzed plaintiff's claim, cost calculations, and identified deficiencies in plaintiff's calculation methodology, in none of plaintiff's filings with this court have plaintiff and plaintiff's counsel addressed, with any specificity, the DOI findings.

---

[6] In plaintiff's cross-motion for summary judgment, plaintiff references Part 6.4(E) of the Agreement and cites to a modified version of the Agreement, executed in June 2012, in which the title of Part 6.4(F) was changed to become Part 6.4(E). Although the quoted language of the provision was not altered, for purposes of clarity, the court cites to the original version of the Agreement, executed in September 2010.

Plaintiff offers a further, albeit unpersuasive argument, that after the term of the Agreement between the defendant and the SCO ended on June 30, 2016, the parties entered into another cooperative agreement that required the SCO "[t]o perform audits and related investigations in accordance with Section 205 of the Federal Oil and Gas Royalty Management Act of 1982, as amended," with a term of July 1, 2016, through June 30, 2019 (the subsequent cooperative agreement). Part 6.5 of the subsequent cooperative agreement required the SCO to calculate fringe benefits and indirect cost rates "in accordance with 2 CFR 200 Subpart E . . . ."[7] The subsequent cooperative agreement also included language stating that fringe benefits "may not exceed the actual costs incurred by the State," and "indirect cost rates . . . may not exceed the State's approved ICR rate." Plaintiff alleges the language of the subsequent cooperative agreement was revised from the earlier cooperative agreement "to eliminate any ambiguity" as to the calculation of fringe benefits and indirect costs. It is established, however, that the

> subsequent revision or clarification of contract language does not constitute an admission or confirmation that earlier language was defective or without any effect. Indeed, such a revision or amendment of procurement language in situations where past problems of disagreement existed is prudent and wise and is not deemed to constitute a legal liability concession of any kind.

Tester Corp. v. United States, 1 Cl. Ct. 370, 374 (1982) (citing Martin Lane Co. v. United States, 193 Ct. Cl. 203, 218 (1970)); see also Iconco v. United States, 6 Cl. Ct. 149, 156 n.8 (1984), aff'd, 770 F.2d 179 (Fed. Cir. 1985); Mason v. United States, 222 Ct. Cl. 436, 447 n.7 (1980).

After review of the Agreement, the court concludes that the terms of the Agreement between the parties at issue in plaintiff's claim for reimbursement for the time period of October 2010 to September 2014 are unambiguous, and, therefore, the court will not look beyond the four corners of the Agreement. See SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d at 1038). The court will not interpret the Agreement against the drafter, as plaintiff requests, because the rule of contra proferentem, which requires ambiguities in a document be resolved against the drafter, only applies when, after examining the entire contract and the circumstances surrounding contract formation, there is a genuine ambiguity in the contract, and the ambiguity remains unresolved. See Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d at 1352 (citations omitted); Tidewater Contractors, Inc. v. United

---

[7] The court notes that following the time period at issue covering plaintiff's claims, October 2010 to September 2014, on December 19, 2014, the DOI did change the administrative regulations applicable to its cooperative agreements, effective December 26, 2014. See Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75,871, 76,050 (Dec. 19, 2014). The regulations at 2 C.F.R. § 200 Subpart E currently govern the application of costs principles to non-federal entities working under certain federal grants or cooperative agreements. See 2 C.F.R. § 200.401.

17

States, 131 Fed. Cl. 372, 392 (2017); Mata v. United States, 114 Fed. Cl. at 746. The plaintiff should have calculated its fringe benefits and indirect costs in accordance with 43 C.F.R. Subpart 12(A), including the OMB Circular A-87, and, permissibly, California's State Administrative Manual. Part 6.4(B) of the Agreement provided that the DOI would reimburse the SCO in accordance with 43 C.F.R. Subpart 12(A) titled "Administrative and Audit Requirements and Cost Principles for Assistance Programs" and Part 8, titled "Standard Award Terms and Conditions," also indicated that the Agreement was subject to the provisions of 43 C.F.R. Subpart 12(A). Thus, the Agreement unambiguously incorporated 43 C.F.R. Subpart 12(A) into the Agreement by making several explicit references to "43 CFR 12(A)." See Precision Pine & Timber, Inc. v. United States, 596 F.3d at 826 (stating that a contract must use unambiguous language of incorporation to incorporate the referenced material) (citation omitted); Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1345 (Fed. Cir. 2008) ("[T]he language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract . . . ."). Pursuant to the Agreement Part 6.4(B), for the time period at issue, the regulations at 43 C.F.R. Subpart 12(A) were applicable to the work performed by the SCO under the Agreement. Moreover, 43 C.F.R. § 12.2 prescribed that grants and cooperative agreement that the DOI enters into with states are subject to OMB Circular A-87.

The Agreement also permitted the SCO to calculate fringe benefits and overhead rates in accordance with California's State Administrative Manual. Part 6.5(C) of the Agreement permitted fringe benefits to be "allowed in accordance with the State's established accounting system," and Part 6.5(D) permitted overhead rates to be "allowed in accordance with the State's established audited accounting system." These two parts, Parts 6.5(C) and (D), stated that the SCO would be allowed to use California's established accounting system when calculating fringe benefits and overhead rates and provided the SCO with the flexibility to choose between any of the several methods for calculating indirect costs specified in OMB Circular A-87 or the method prescribed in California's accounting systems in Section 8740 of California's State Administrative Manual when submitting its requests for reimbursement of indirect costs to the DOI.[8]  Likewise, the SCO could have computed fringe benefits in accordance with OMB Circular A-87, Attachment A, Section 8(d), "Fringe benefits," or it could have computed fringe benefits in accordance with California's State Administrative Manual.

With the exception of the regulations specifically pertaining to fringe benefits and overhead rates, the administrative regulations and cost principles prescribed in OMB Circular A-87, however, still applied to the SCO's requests for reimbursement, even if the SCO chose to bill utilizing California's State Administrative Manual. Parts 6.5(C) and (D)

---

[8] OMB Circular A-87, Attachment E, Section C, "Allocation of Indirect Costs and Determination of Indirect Cost Rates," provided that indirect costs were to be allocated and computed in accordance with the simplified method, multiple allocation base method, or special indirect cost rates method of calculating indirect costs. See OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments.

18

of the Agreement did not render inapplicable the basic guidelines contained in Attachment A of OMB Circular A-87, including the requirement that costs be necessary, reasonable, and allocable. See OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments. When the SCO opted to use the accounting system contained in California's State Administrative Manual, the DOI was required to reimburse the SCO for its costs, only if those costs met the requirements for reimbursement contained in both California's State Administrative Manual and OMB Circular A-87.

Moreover, that only actual or incurred costs were eligible for reimbursement by the DOI under the Agreement was unambiguous in the Agreement because the plain language of the Agreement in effect dictated that only costs actually incurred by the SCO were eligible for reimbursement under the Agreement. Under Part 2 of the Agreement, the DOI's obligation was to "reimburse the State up to 100 percent of allowable costs . . . ." Agreement Part 6.4(B) limited the DOI's obligation to reimburse the SCO to "approved costs incurred under this Agreement in accordance with 43 CFR 12(A) Administrative and Audit Requirements and Cost Principles for Assistance Programs." (emphasis added). Moreover, under Part 5.2 of the Agreement, to be reimbursed, the SCO was required to submit requests for reimbursement after the end of each pay period, along with a summary of activities and a "certified summary of costs incurred during the period for which the State has requested reimbursement." (emphasis added). Part 7.1(D) of the Agreement required the SCO to maintain records "in sufficient detail to clearly demonstrate the total actual costs associated with the project," and Part 7.3 required the records be in sufficient detail to allow an "an annual fiscal audit to determine that costs incurred by the State are allocable, allowable, and eligible for reimbursement . . . ." (emphasis added). Read in conjunction, Parts 2, 5.2, 6.4(B), 7.1(D), and 7.3 demonstrate that the Agreement only required the DOI to reimburse those costs the SCO actually incurred when performing under the Agreement. The term "costs incurred" is not an ambiguous term. If the SCO billed the DOI for salary, fringe benefits, and indirect costs it had not incurred, then the SCO was not entitled to reimbursement for those costs.

Additionally, that Parts 6.5(C) and (D) of the Agreement permitted the SCO to compute fringe benefits and overhead rates in accordance with California's State Administrative Manual did not alter the Agreement's requirement that costs had to be actually incurred in order to be eligible for reimbursement by the DOI. Nor did the SCO's ability to choose between the two accounting methods alter the language in Part 6.5(B), titled "Salaries and Wages," which stated that "[s]alaries and wages may not exceed the State's established policy and practice including the established pay scale for equivalent classifications of employees whose salaries are financed from non-Federal sources . . . ." Provided the SCO sought reimbursement for costs it had actually incurred, the SCO could account for fringe benefits and indirect costs in accordance with the method prescribed in Section 8740 of California's State Administrative Manual, even if Section 8740 did not comport with the methods for calculating fringe benefits in OMB Circular A-87, Attachment A, Section 8(d) or calculating indirect costs in OMB Circular A-87, Attachment E, Section C. The SCO's ability to choose between the OMB's method and California's State Administrative Manual method for calculating fringe benefits and

overhead rates did not alter Part 6.4(B)'s limitation that the DOI only "will reimburse the State for approved costs incurred under this Agreement in accordance with 43 CFR 12(A) . . . ."

The court is also not persuaded by plaintiff's argument that Part 6.4(F) of the Agreement creates an ambiguity in the Agreement. Part 6.4(B) states that the DOI will reimburse the SCO for "approved costs incurred" under the Agreement in accordance with 43 C.F.R. Subpart 12(A). Part 6.4(F) "provides for cost reimbursement of expenses subject to 43 CFR 12 that have not otherwise been provided for in this Agreement." The court notes that the general purpose of the Agreement between the defendant and the SCO was "[t]o perform audits and related investigations in accordance with Section 205 of the Federal Oil and Gas Royalty Management Act of 1982, as amended (FOGRMA)." Part 6.4(F) provides only that the cost reimbursement of expenses otherwise not provided for in other parts of the Agreement are also subject to 43 C.F.R. Part 12, and is directed to work associated with "Federal rulemakings, the Royalty Policy Committee, training and other [DOI] sponsored activities relevant to policy development related to federal onshore and offshore mineral revenues," and does not address the costs associated with the SCO's main work of providing assigned audit and investigation services to the DOI pursuant to the Agreement. Nothing in Section 6.4(F) altered the terms of the Agreement, which provided for the reimbursement of costs subject to 43 C.F.R. Part 12 and provided that actual incurred costs only would be reimbursed. The plain language of Part 6.4(B) limited reimbursable costs to those costs the SCO actually incurred.

Thus, as discussed, the court finds the cost principles and administrative requirements contained in 43 C.F.R. Subpart 12(A), OMB Circular A-87, and, when calculating fringe benefits and indirect costs, permissible use of the California's State Administrative Manual, applied to the Agreement. The court also finds that only costs the SCO actually incurred in connection during performance pursuant to the Agreement were eligible for reimbursement by the DOI.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is **GRANTED** and plaintiff's cross-motion for summary judgment is **DENIED**. Plaintiff's complaint is **DISMISSED**, and the Clerk's Office is directed to enter **JUDGMENT** in accordance with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**